UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MARTHA RANGEL, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| VS. | § | CIVIL ACTION NO.  SA 09 CA 0811 |
| | § | |
| OMNI HOTELS MANAGEMENT | § | |
| CORPORATION A/K/A OHMC | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND BRIEF IN SUPPORT**

TO THE HONORABLE U. S. DISTRICT COURT JUDGE:

COMES NOW Plaintiff, Martha Rangel, and makes and files this her Plaintiff's Response to Defendant's Motion for Summary Judgment and Brief in Support, and in support thereof respectfully shows this Honorable Court the following:

## I.    INTRODUCTION

Plaintiff, Martha Rangel, who formerly served as the human resources director ("HRD") at the Omni San Antonio Hotel at the Colonnade ("Colonnade" or "hotel"), had developed a reputation for honesty, fairness, and equally applying Omni's policies regarding sexual harassment to all Omni employees, regardless of their level within the company.  This did not sit well with Cesar Cantor, her supervisor and general manager ("GM") of the Colonnade, who enjoyed engaging in inappropriate behavior with young female employees that exposed Omni to potential civil liability and risk of lawsuits.  Plaintiff, in her usual manner, did not hesitate to caution Cantor about his behavior on a number of occasions.  After being counseled by Plaintiff, Cantor responded by engaging in retaliatory conduct against her.  Plaintiff complained to her

supervisor, the area director of human resources, who in turn reported the complaint to the corporate director of human resources about the continuing acts of retaliation by Cantor.  Cantor perceived Plaintiff as a threat to his job for Plaintiff never hesitated to enforce Omni's sexual harassment policy against her superiors, including Cantor.

In further retaliation and with motive to oust Plaintiff as HRD, Cantor lied about Plaintiff's role during the investigation into alleged illegal drug activity on the Colonnade's premises.  In that regard, Cantor falsely accused Plaintiff of making a deal with the alleged drug dealer to not call the police in exchange for the names of other Omni employees allegedly engaged in illegal drug activity.  Plaintiff did not make any deal with a drug dealer nor did she hire the employees Defendant has subsequently accused her of hiring.  Despite the fact that Cantor and other similarly-situated male employees committed the same misconduct alleged against Plaintiff, Plaintiff, the only female involved in the investigation, was the only executive committee member terminated.

Summary judgment for Defendant Omni Hotels Management Corporation a/k/a OHMC should be denied.  Not only is the record replete with genuine disputed issues of material fact, but also the undisputed facts clearly allow a reasonable trier of fact to infer that Defendant's proffered non-discriminatory reasons are false or unworthy of credence and therefore served merely as pretext.  The facts demonstrate that Plaintiff was discriminated against on the basis of her gender and was a victim of retaliation against for making a complaint against her supervisor.

## II.    STATEMENT OF FACTS

1.    <u>Plaintiff's employment history at OHMC</u>

Plaintiff had been employed by Omni Hotels Management Corporation ("Defendant," "OHMC," or "Omni") for a total period of about ten years since 1996 prior to the date of her

wrongful termination.  As a testament to her exemplary record, stellar reputation and dedication, Plaintiff steadily rose through the ranks in the human resources department where she began as an administrative assistant and was ultimately promoted to serve as the Human Resources Director ("HRD") at the Colonnade.  (Ex. D, 4-10).  Throughout her tenure at Omni, Plaintiff exhibited great pride in being an Omni employee and personified Omni's "Power of One" company philosophy by always acting to serve the best interests of the hotel's guests.

In March 2006, while Plaintiff was employed as the recruitment manager at the Omni Corpus Christi, the Omni corporate Vice-President of Human Resources offered Plaintiff the opportunity to serve on a task force at the Colonnade with the possibility of serving as its HRD. (Ex. A, 93:3-24).  Plaintiff obviously performed well, because only one month later, Cantor, the GM at the Colonnade, offered Plaintiff the position of HRD which she accepted.  As HRD, Plaintiff was also a member of the executive committee which comprised the senior management team at the Colonnade.  (Ex. H).  Plaintiff's duties included enforcing Omni's employment policies and conducting investigations into employee complaints such as reports of harassment. (Ex. A, 174:18-175:6).  During Plaintiff's tenure as HRD at the Colonnade, she consistently met or exceeded expectations and garnered a reputation for truthfulness.  (Ex. D, 28:4-13; 29:4-10); (Ex. F, 14:2-7); (Ex. I).  Michelle Smith, the Area Director of HR and Plaintiff's immediate supervisor in the HR function, has testified to Plaintiff's reputation for truthfulness and her ability as HRD, admitting, "Martha was a good HRD, yes."  (Ex. D, 24:15-17).

    2.    <u>The harassment and retaliation by Plaintiff's supervisor, Cantor, and Plaintiff's complaint of the same</u>

As a fair and effective HRD, Plaintiff enforced Omni's anti-sexual harassment and retaliation policies against all employees, regardless of their rank within Omni.  (Ex. D, 25:24-26:2; 28:16-18).  Around August 2008, for approximately the third time, Plaintiff received word

that her supervisor and the GM of the Colonnade, Cantor, had been engaging in inappropriate behavior with a female employee that could risk liability to the hotel.  (Ex. C, 17-18); (Ex. E, 11).  Similar to the previous times, she did not hesitate to advise him against such behavior. (Ex. D, 23-24).  Plaintiff explained to Cantor that she was simply looking out for him; however, Cantor took offense and demanded to know if he was under investigation and informed her that she was "out of line" for reporting the incident to Smith, the Area Director of HR.  (Ex. C, 17:11-18:23); (Ex. A, 196:5-25).  From that point forward, Cantor began harassing Plaintiff constantly and questioned the manner in which she performed her duties of which he had never before expressed an interest.  (Ex. A, 189).  Before that incident, Cantor had trusted Plaintiff implicitly to make decisions.  Plaintiff subsequently reported to Smith that Cantor was retaliating against her for counseling him, and Smith in turn reported Plaintiff's complaint to Jim Snow, Cantor's supervisor and the former Vice-President of Operations of Omni hotels.  Plaintiff's complaint of Cantor's retaliatory conduct towards her reached the corporate level to Joy Rothschild, the Senior Vice-President of Human Resources at Omni hotels, who advised Snow to counsel Cantor.  (Ex. C, 17-18); (Ex. A, 187:15-18; 188:25-190:10); (Ex. D, 26:8-19); (Ex. E, 11:24-13:22); (Ex. F, 17).  Although Smith assured Plaintiff she would not suffer any adverse action, Plaintiff experienced otherwise.  (Ex. A, 192:13-20).

    3.    <u>Plaintiff's "by the book" handling of the drug investigation on hotel property</u>

Plaintiff was terminated on March 16, 2009, for acting at the direction and supervision of Cantor during the investigation into the illegal drug activity uncovered at the Colonnade on March 11, 2009.  That evening, Plaintiff received a tip from Mauricio Name, the banquet manager, informing her that Javier Reyna, a dishwasher, and several other hotel employees were involved in the distribution of illegal drugs on the hotel property.  (Ex. A, 215:17-216:2).

4

Plaintiff immediately directed Luis Gonzalez, the loss prevention manager and head of security at the Colonnade, to conduct a baggage search of the suspected drug dealer and of all the employees identified as being involved in the illegal activity.  (Ex. A, 218:9-20).  About an hour later when Gonzalez informed Plaintiff that he discovered cocaine in Reyna's possession, Plaintiff instructed Gonzalez to call the police and to see what kind of information he could obtain.  (Ex. F, 66:2-6); (Ex. A, 221-222).  Plaintiff immediately next called Cantor to inform him of the situation and to obtain direction on handling it.  (Ex. A, 226:17-18); (Ex. F, 66:2-6).  The situation was a security matter and it fell squarely within Cantor's responsibilities as the GM of the Colonnade.  (Ex. J).  Next, Gonzalez called Plaintiff with the list of employees given to him by Reyna.  (Ex. A, 227:13-16).  Plaintiff did not ask for these names or make any sort of deal with Reyna to obtain these names.  (Ex. A, 225:22-226:5).  However, before Plaintiff arrived back at the hotel that evening, Gonzalez inexplicably released Reyna without Plaintiff's knowledge or approval.  (Ex. A, 228).

When Plaintiff informed Cantor that she had instructed Gonzalez to call the police, he opposed the action saying, "I don't care if there is one less person in jail.  I want you to clean house and get as much information as you can." (Ex. A, 227).  Per Cantor's explicit order and to her detriment, Plaintiff did not call the police.  (Ex A., 228).  Plaintiff immediately set out to drug screen the implicated employees per Cantor's directive.  (Ex. A, 229).  Plaintiff informed the implicated employees of the allegations made against them and presented them with the choice to voluntarily consent to a drug screen, refuse the drug screen and be terminated, or resign.  All told, fourteen employees either resigned or tested positive, the majority of whom worked under two male members of the executive committee: Thad Crennen, the Food and Beverage Director, and Steve White, the Director of Engineering.   (Ex. A, 228).

During this entire time, Cantor had been socializing at the home of Mr. Name, the employee who provided the tip to Plaintiff; however, Cantor told Plaintiff he had been at a "business meeting." (Ex. G, 16:21-17:8); (Ex. A, 234:20). Although this matter was of such a serious nature to warrant Cantor's prompt presence at the hotel, he did not bother to arrive at the Colonnade until two and half hours after Plaintiff informed him of the situation despite that fact that he was only fifteen minutes away. (Ex. C, 56:13-15); (Ex. G, 25:13-15); (Ex. F, 84:18-21). Cantor testified that he took his time in getting to the hotel property because he trusted that the matter was in good hands with Plaintiff. (Ex. C, 56:22-24). When Cantor finally arrived over two hours later, he instructed Plaintiff to put the drugs in the safe but at no time did he call the police or instruct Plaintiff to do so. (Ex. C, 65:23-66:20; 67:6-8). He only said, "[W]e'll deal with that tomorrow." (Ex. A, 233:11-18). By this time, it was around 11:00 p.m., March 11, 2009.

The next morning on March 12, 2009, around 9:30 a.m., Plaintiff informed Smith of the previous night's incidents. Smith's response was, "Good job. Good job. That just speaks volumes for your credibility. Thumbs up. Good job. Keep going." (Ex. A, 240:21-242:4); (Ex. D, 86-87). Not once did Smith ask Plaintiff if she had called the police. It was not until much later around 1:45 p.m. in the afternoon until Smith emailed Plaintiff to ask if the police had been called, despite the fact that she had been apprised of the events since 9:30 a.m. (Ex. K). Moreover, Cantor did not even inform his supervisor, Snow, of the events until the next day on March 13, 2009. (Ex. C, 37:1-5). It was only after corporate had been informed of the situation that Plaintiff was given the explicit order to call the police. (Ex. C, 77:24-78:7).

On March 14, 2009, Plaintiff reviewed Reyna's personnel file and it was the first time that she was presented with his criminal background. (Ex. L). Sylvia Mendoza, the human

resources manager under Plaintiff whose duty was to conduct background checks of potential new hires and present them to Plaintiff, failed to do so in Reyna's case. (Ex. A, 136:10-137:7; 142:8-11; 144). At this time on the morning of March 12, 2009, Cantor disclosed to Plaintiff that Snow and Smith were "gunning for you." (Ex. C, 41:16-18). When Plaintiff reminded Cantor that he was the one who instructed to refrain from calling the police and to obtain the names of the employees engaged in the illegal drug activity, he responded, "Oh, yeah. I had forgotten about that. Well, then, that was my bad." (Ex. B, 19:20-20:3). Cantor falsely assured Plaintiff that he would support her and that he was the one who made the decision to not call the police.

4.    Omni's inadequate, unreasonable, and lack of a good faith "investigation"

On Monday, March 16, 2009, before Plaintiff was interviewed by Snow and Smith about the events, Cantor again informed Plaintiff that "they," in reference to Snow and Smith, were "gunning for you." (Ex. B, 22:12-23:6). This placed Plaintiff in immediate fear that her position as HRD was in jeopardy, and caused her to become very fearful and guarded when she was questioned by Mr. Smith and Ms. Snow. (Ex. E, 47:13-23). Plaintiff's fear was warranted when Snow and Smith did not even question her about her handling of the drug investigation and the drug screening of the implicated employees. (Ex. B, 29). Instead, Snow angrily reminded Plaintiff that the lawsuit at the Omni Corpus Christi from years ago when Plaintiff was a recruitment manager had cost the hotel $50,000.00.[1] (Ex. B, 26:2-28:4). When asked about

---

[1] Defendant's Motion for Summary Judgment references a lawsuit against Omni Corpus Christi involving an assault by an Omni employee, S.C., against a hotel guest. At that time, Plaintiff's was employed as a recruitment manager, a human resources position substantially similar to that of a human resources manager. Per Omni's policy, the duty to conduct criminal background checks on potential new employees belongs to the HR or recruitment manager, not the HRD. Although Plaintiff had recommended against the hiring of S.C. based on his criminal background, two department heads spoke on this employee's behalf and assured Plaintiff that S.C. would be under their strict and direct supervision. Based on their recommendation, Plaintiff only agreed to hire S.C. on an "on-call" probationary status. Nevertheless, due to this incident, Plaintiff adapted her practice regarding background checks and otherwise continued to perform beyond expectations as evidenced by her subsequent promotion to the HRD at the Colonnade. (Rangel Dep. 74-75). Rothschild has testified that Plaintiff's past experience with Omni merited her as being worthy of rehire. (Rothschild Dep. 12:5-9).

7

Reyna's background, Plaintiff explained to Snow the difference in duties between a HRD and HR manager and that it was Ms. Mendoza's responsibility to bring positive criminal backgrounds to her for her review.  However, Snow refused Plaintiff's accurate and truthful explanation.  During the cursory interview, both Snow and Smith mentioned that if they had to drug test their employees, they would lose "all of [their] employees."  (Ex. B, 26:17-18).

Because he and Smith failed to question Plaintiff about her handling of the drug investigation, it was clear to Plaintiff that Snow and Smith had already made the decision to terminate her employment.  (Ex. B, 41:15-23).  This fear was realized later that same day when Snow informed Plaintiff that her employment with OHMC would be terminated.  When she asked on what basis, he replied, "We are going to use falsification of information."  (Ex. B, 34:23-35:4).

### III.    ARGUMENT AND AUTHORITIES

Plaintiff was the only female terminated as a result of the investigation into illegal drug activity at the Colonnade, yet her own HR supervisor, Smith, testified that she properly and correctly handled the investigation per Omni's "Power of One" philosophy.  (Ex. D, 34, 35, 86:3-89:7).  Plaintiff was also retaliated against by her supervisor, Cantor, after she made a complaint to the corporate level that he was retaliating against her for reporting his improper conduct.  Cantor made false statements about Plaintiff's role in the drug investigation that ultimately formed the basis of her wrongful termination.  Furthermore, the record is replete with issues of material fact regarding Defendant's proffered non-discriminatory/retaliatory reasons for discharging Plaintiff, which merely served as pretext.

**A.      Plaintiff satisfies the *prima facie* elements of sexual discrimination.**

Under Title VII, 42 U.S.C. § 2000e *et seq.*, a plaintiff must establish a *prima facie* case of discrimination through circumstantial evidence by demonstrating that (1) she is a member of a protected class; (2) she was qualified for the position at issue; (3) she was the subject of an adverse employment action; and (4) others similarly situated but outside the protected class were treated more favorably, which is also known as disparate treatment. *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 310 (5th Cir. 2004); *Alvarado v. Texas Rangers*, 492 F.3d 605, 611 (5th Cir. 2007). It should be noted that "[t]o establish a *prima facie* case, a plaintiff need only make a very minimal showing." *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996).

Defendant has conceded that Plaintiff has satisfied the first three elements required to establish a *prima facie* case of sex discrimination. Plaintiff can also establish the fourth element because she and Cantor were "similarly situated." His employment was not terminated as a result of the investigation into the illegal drug activity he allowed on the hotel property which he managed as the GM. In order "to establish disparate treatment, a plaintiff must show that the employer 'gave preferential treatment to [another] employee under "nearly identical" circumstances…'" *EEOC v. Columbia Sussex Corp.*, 632 F. Supp. 2d 576, 579 (M.D. La. 2009)(citing *Okoye v. Univ. of Tex. Houston Health Science Ctr.*, 245 F.3d 507, 514 (5th Cir. 2001)). However, the Fifth Circuit does not interpret "nearly identical" as synonymous with "identical." *Lee v. Kan. City Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009). Most importantly, "the plaintiff's conduct that drew the adverse employment decision must have been "nearly identical" to that of the proffered comparator who allegedly drew dissimilar employment decisions." *Id*.

1.   Plaintiff and Cantor were "similarly situated," and Plaintiff can therefore establish a *prima facie* claim of discrimination on the basis of sex.

Defendant's argument that Plaintiff and Cantor were not "similarly situated" is superficial and without merit.  Both Plaintiff and Cantor were members of the executive committee, a select group that comprised the senior management team at the Colonnade.  (Ex. A, 144:25-145:4).  Furthermore, a difference in job titles alone is not sufficient to make a finding that two employees were not "similarly situated."  In *EEOC v. Columbia Sussex Corp.,* the Court, in its analysis of whether two employees were "similarly situated," ignored the employees' job duties and titles and instead focused on the conduct giving rise to the employee's termination, and whether such conduct differed from the employee who was not terminated.   In that case, a male hotel employee whose title was "banquet manager" was terminated after complaining about the hotel's GM, while the "food and beverage manager," a female who also made identical complaints, was not terminated.   Though their titles inferred different responsibilities and duties, the Court nevertheless concluded that there was, indeed, a question of material fact regarding whether the two employees were "similarly situated."  *EEOC*, 632 F. Supp. 2d at 581.

Likewise, "it is sufficient that the ultimate decision-maker as to [the] employees' continued employment is the same individual, even if the employees do not share an immediate supervisor."  *Lee*, 574 F.3d at 260-61.  Defendant attempts to argue that Plaintiff and Cantor were not similarly situated because Plaintiff reported to Smith and Cantor reported to Snow. This argument, too, is inaccurate and superficial.  Snow admitted that he made the decision to terminate Plaintiff's employment.  (Ex. E, 17: 9-11).  Moreover, because Defendant admits that Plaintiff reported to Cantor at the Colonnade, she could not have shared the same immediate supervisor in that regard.  Snow participated in the ultimate decision over both Plaintiff and

Cantor's continued employment.   The only difference is that Snow merely counseled Cantor while he terminated Plaintiff.

Next, Defendant attempts to argue in futile that Plaintiff and Cantor's duties did not overlap in any meaningful way.  Defendant fails to consider the glaring undisputed facts that Plaintiff was acting in the capacity as GM by handling the security issue involving the drug investigation that evening of March 11, 2009.  Both Smith and Rothschild have testified that the HRD is not responsible for security matters.  (Ex. D, 7:21-24); (Ex. F, 22:14-17).  Furthermore, Snow counseled Cantor that it was his obligation as GM to take charge of leading the investigation into the illegal drug activity immediately when Plaintiff informed him of the matter, yet he failed to do so.  (Ex. J).  Because Plaintiff was clearly acting outside her role as HRD and in the capacity of GM that evening of March 11, 2009, Defendant is estopped from asserting Plaintiff's duties did not overlap with Cantor's.

    2.    <u>The reasons cited for Plaintiff's termination were "nearly identical" to the misconduct committed by Cantor, who was not terminated.</u>

The critical focus in determining disparate treatment is on the alleged misconduct for which the employee was terminated.  *Lee*, 574 F.3d at 260.  The stated reason given for Plaintiff's termination was that she "committed serious errors in judgment" the evening of March 11, 2009, by "cutting a deal" with the Reyna in which she would not call the police in exchange for the names of other employees involved in the illegal drug activity.[2]  Not only does Plaintiff firmly and adamantly deny this allegation, but multiple employees including Cantor, Plaintiff's immediate supervisor, failed to call the police.  (Ex. C, 51:7-23).  Smith has testified that the decision to call the police belonged to the Cesar as the GM, and Gonzalez could have also called

---

[2] Rothschild has testified that whoever made the decision to not call the police would have been in "real trouble." (Ex. F, 55:4-14).  Snow also testified that whoever made the decision to not call the police was an "important fact." (Ex. E, 29:25-30:2).

the police.  (Ex. E, 56:10-13; 82:20-25).  Rothschild has also testified that she would have expected Gonzalez, to have called the police.  (Ex. F, 65:15-17).  Rather, Cantor directed Plaintiff to not call the police when she informed him of the situation immediately after the information was presented to her.

There is no "marked distinction" between what Defendant alleges Plaintiff failed to do, and what Cantor undisputedly did not do in his duty as GM—call the police.[3]  *Lee*, 574 F.3d at 261 n.26.  When asked in his deposition about when and why he called the police, Cantor admits:

> Q:    When did you decide to call the police?
>
> A:    On Friday, March 13
>
> Q:    What led you to that decision?
>
> A:    Joy Rothschild and Richard Maxfield from Corporate Office instructed me to do so.
>
> Q:    Why?  What'd they tell you?
>
> A:    That in their judgment, the – the police should be called.  (Ex. C, 77:24-78:7).

Cantor has admitted that in his judgment, the police were not to be called, which is the essentially the identical misconduct of which Plaintiff has been falsely accused.  Cantor has also admitted that if he did not want Plaintiff to "cut the deal", as GM of the Colonnade, he could have instructed her in that regard.[4]  (Ex. C, 53: 10-25).

Likewise, Rothschild has also testified that Cesar maintained some responsibility for what happened to Plaintiff and the drug ring that occurred on the hotel property he managed.

---

[3] There has been conflicting testimony from OHMC's top executives on whether Plaintiff should have called the police despite Cantor's directive otherwise.  Snow testified that as Cantor was her GM, she was obligated to follow his instructions to not call the police.  (Ex. E, 23:6-18).  Omni's Standards of Conduct state that its employees must follow their supervisor's instruction.  (Ex. M).  However, Rothschild has testified that Plaintiff should have defied Cantor's order and called the police.  (Ex. F, 87:10-19).

[4] Plaintiff denies any allegation that it was her decision to not call the police in exchange for the names of employees.

(Ex. F, 44:9-12). Additionally, Gonzalez, the employee in charge of security, not only failed to call the police but allowed Reyna to leave the hotel premises without Plaintiff's knowledge or approval, and he received no disciplinary action for these failures. (Ex. D, 56:10-13). The police were called only after the situation was reported multiple levels up to corporate, to Richard Maxfield, the former senior Vice President of Operations of Omni, who gave the directive. It is undisputed that both Cantor and Gonzalez were guilty of the identical misconduct alleged against Plaintiff. However, Plaintiff, who was a female and whose only error was following the directive[5] of her supervisor who was a fellow member of the executive committee, was the only employee involved in the investigation of the drug ring who was terminated.

**B.**    **Plaintiff was discriminated against on the basis of her sex because she was the only female member on the executive committee, and the only employee involved in the investigation into the drug ring who was terminated.**

Defendant attempts to argue that numerous other male and female employees[6] were terminated as a result of the investigation into the illegal drug activity at the Colonnade and therefore Plaintiff's termination was not motivated by sex. This argument is unavailing and inapposite. In *Rachid v. Jack in the Box, Inc.*, the Fifth Circuit explained, "[t]his court and others have held that testimony from former employees who had different supervisors than the plaintiff, who worked in different parts of the employer's company, or whose terminations were removed in time from the plaintiff's termination cannot be probative of whether age was a determinative factor in the plaintiff's discharge." *Rachid*, 376 F.3d at 314 (citing *Wyvill v. United Co. Life Ins. Co.*, 212 F.3d 296, 302 (5th Cir. 2000)). Likewise, the termination of the employees as referenced by Defendant is entirely distinguishable from Plaintiff's discharge.

---

[5] *See supra* note 3.
[6] Defendant has cited Julian Mendiola's termination as evidence that Plaintiff's termination was not motivated by sex. However, Mendiola, though a male, was not an executive committee member, worked only in the restaurant, and was terminated for a reason different than the stated reason given for Plaintiff's wrongful termination. (Ex. H)

First, these were all employees who were terminated because of their involvement in the drug activity and not related to their participation in the investigation into the drug activity. Moreover, they were not members of the executive committee, nor were they accused of committing the misconduct erroneously alleged against Plaintiff.  Unlike Plaintiff, these employees voluntarily chose to resign or tested positive for narcotics, a clear and objective violation of any company's policy.  Their termination and/or resignation were not determined by Snow or Smith and therefore have no bearing on whether Plaintiff's employment was terminated on the basis of sex.

There was no difference in conduct to account for the differential treatment of Plaintiff and other similarly-situated males of the executive committee level or higher.  These individuals included Cantor, Thad Crennen, the Director of Food and Beverage who supervised a majority of the employees who were terminated as a result of the drug investigation, and Chris Chavez, the Director of Rooms and Gonzalez's supervisor.  Both Cantor and Gonzalez, who were responsible for handling the drug investigation, failed to call the police until corporate gave the directive. Neither Gonzalez nor his supervisor, Chavez, was counseled in this regard.  (Ex. C, 65:17-22). Cantor was formally counseled while Crennen was only verbally counseled.  (Ex. E, 50:1-4). However, Plaintiff, who appropriately handled the investigation, who did not supervise any of the implicated employees, and who did not perform any type of security function in her position as HRD, was the only female member on the executive committee whose employment was terminated.  (Ex. D, 34, 35, 67, 81, 86-89).  By contrast, the males who were involved and shirked their responsibilities within their respective job descriptions were merely counseled. (Ex. E, 50).

**C.     Plaintiff has raised questions of material fact regarding the proffered non-discriminatory reasons given for her termination, which were merely pretext.**

If the employer sustains its burden, the *prima facie* case is dissolved, and the burden shifts back to the plaintiff to establish that the employer's proffered reason is not true but is instead a pretext for discrimination. *Alvarado*, 492 F.3d at 611. Pretext may be established "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or "unworthy of credence."" *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000). While discrimination is the ultimate issue for trial, a finding of pretext may be determinative at the summary judgment stage. *Anderson v. Goodyear Tire & Rubber Co.*, 367 F. Supp. 2d 1061 (E.D. Tex. 2004). In the context of summary judgment, the question is not whether the plaintiff proves pretext, but rather whether the plaintiff raises a genuine issue of fact regarding pretext. *Britt v. Grocers Supply Co.*, 978 F.2d 1441 (5th Cir. 1992).

1.     A genuine issue of material fact exists as to whether the failure to contact the police following the discovery of illegal drugs on hotel property was a legitimate non-discriminatory reason for Plaintiff's discharge.

In *Rachid v. Jack in the Box, Inc.*, the Fifth Circuit found that a genuine issue of material fact existed as to whether the proffered reason given for the plaintiff's termination, in fact, constituted a violation of company policy. 376 F.3d at 313. While the Court acknowledged that violating a non-discriminatory company policy was adequate grounds for termination, it found that due to the appellant/plaintiff's claims, issues of material fact existed regarding the contents of the employer's policy. *Id.*

OHMC argues that it had a non-discriminatory reason for firing Plaintiff – her alleged decision to not call the police. Though Plaintiff denies this allegation, the facts are undisputed that Cantor and Gonzalez both failed in their respective duties as GM and manager of security to call the police, yet neither one was terminated. Interestingly, not only did Smith testify that there

is no policy which states that the police are to be called when an employee is found with drugs, Smith testified that Gonzalez did not violate company policy when he failed to call the police when he found drugs on Reyna.  (Ex. D, 82).  This is arguably direct evidence of discrimination, as Defendant applied an opposite standard to Plaintiff, who was a female and whose employment was terminated.  By contrast, Gonzalez's undisputed failure to call the police was deemed to not be a violation of policy.  Without a doubt, a trier of fact could more than reasonably find that Defendant discriminated against Plaintiff on the basis of sex.

Because there is no policy against failing to call the police when an employee has been found with drugs, Cantor and Gonzalez's failure to call the police and Omni's subsequent failure to immediately terminate their employment undoubtedly raises a question of material fact as to whether this cited misconduct was, in fact, an egregious violation of Omni's policy warranting Plaintiff's termination.  This genuine issue of material fact is a threshold inquiry regarding pretext, and it alone is sufficient to preclude summary judgment.  Accordingly, this material fact dispute renders irrelevant the issue of whether Defendant reasonably and in good faith believed Plaintiff committed the misconduct alleged against her.

2. <u>Questions of material fact exist as to whether OHMC reasonably believed in good faith the allegations of Plaintiff's misconduct.</u>

Assuming *arguendo* that Defendant could show that no genuine issue of material existed as to whether the failure to call the police was an objective violation of Omni's policy warranting discharge, numerous issues of material fact exist regarding Defendant's reasonable and good faith belief that Plaintiff engaged in this alleged misconduct.

The decision to discharge Plaintiff was based solely on Snow's conclusion that Plaintiff was lying due to the false statements of two males, Cantor and Gonzalez.  (Ex. E, 18:1-5; 48:23-49:8).  However, both Smith and Snow testified that they knew Plaintiff and in their experience,

Plaintiff was a truthful and straightforward person.  (Ex. D, 28:4-15); (Ex. E, 25:4-12).  Smith further testified that she believed Plaintiff was telling the truth when Plaintiff told her that Cantor conveyed to Plaintiff, "they (Snow and Smith) are gunning for you."  (Ex. D, 19:4-24).  Cantor, knowingly and with a retaliatory motive, made this statement directly to Plaintiff immediately prior to her interview with Snow and Smith during the investigation.  *Id.*  Despite the fact that both Snow and Smith were personally aware of Plaintiff's previous complaint regarding Cantor's retaliatory actions against her and Cantor's complete lack of credibility,[7] they unreasonably chose to believe Cantor's false statement.  (Ex. D, 26-27); (Ex. E, 12-13).  It is disingenuous and unreasonable for Smith and Snow to assert that they did not reasonably and in good faith believe Plaintiff when Plaintiff averred that she did not make the decision to not call the police.

Smith's testimony that Plaintiff had sufficient reason to fear her job was in jeopardy and that she was targeted as the scapegoat, supports Plaintiff's testimony that Snow and Smith did not question her about her handling of the events beginning the evening of March 11, 2009, during their investigation.  Snow and Smith's lack of a complete and fair investigation raises an issue of material fact of whether they reasonably and in good faith believed the allegations against Plaintiff.  (Ex. A, 26); (Ex. D, 118:22-25).

Furthermore, documents produced by Omni raise a genuine issue of material fact regarding whether Defendant reasonably and in good faith believed the allegations against Plaintiff.  In a timeline of events written by Cantor and sent to Snow, nowhere does it say that Plaintiff "cut the deal" with Reyna.  (Ex. N).  Instead, it states that Gonzalez obtained the names

---

[7] A jury may infer that Cantor and Gonzalez lacked credibility because they undisputedly did not call the police – the cited reason for Plaintiff's termination.  By March 13, 2009, before Smith and Snow's investigation on March 16, 2009, Cantor and Gonzalez were well aware that based on corporate's directive to call the police, the failure to call the police was the sticking point that could jeopardize their positions.  A jury could reasonably infer a "suspicion of mendacity" from their false statements that it was Plaintiff who made the decision to not call the police.  *Laxton v. Gap Inc.*, 333 F.3d 572, 579 (5th Cir. 2003).

from Reyna and gave them to Plaintiff.  In addition, notes contained in Cantor's file from what appears to have been taken during the regular course of business during Omni's investigation indicates that "[h]e made "the deal."  Presumably "he" would be either Cantor or Gonzalez.[8] (Ex. O).  These documents, available to Snow and Smith during their investigation, contradict Cantor and Gonzalez's false statement that Plaintiff was the one who "cut the deal" with Reyna.

This reason given for Plaintiff's termination, that she was the one who "cut the deal" with Reyna, cannot be characterized as anything other than pretext.  Snow and Smith unreasonably believed Cantor's false statement despite being notice of his retaliatory actions against Plaintiff. They failed to conduct a fair and impartial investigation, and the evidence clearly demonstrate issues of material fact as to whether Smith and Snow reasonably believed in good faith that Plaintiff "cut the deal" with Reyna.

3.   Plaintiff did not approve the hiring of Reyna and other employees with significant criminal histories as alleged by OHMC.

Defendant has asserted in this litigation, as the second reason for Plaintiff's termination, that it was Plaintiff who was responsible for hiring Reyna and other employees[9] with positive criminal backgrounds simply because she was the HRD and head of the human resources department.  This proffered explanation is flawed and unworthy of credence because Cantor, as the GM who is ultimately responsible for the hotel's entire operations, was not terminated for

---

[8] Snow admits that if Plaintiff did not "cut the deal" with Reyna, it would have been either Cantor or Gonzalez who did.  (Ex. E, 39:2-7).

[9] The "other employees" referenced by Defendant are presumed to be W.S. and V.C.  Plaintiff did not approve the hiring of these individuals because the HR coordinator hired them before she presented Plaintiff with their backgrounds for review.  When Plaintiff discovered that they had been hired without her approval, she promptly directed her HR coordinator to rescind the offers before the start date.  W.S. and V.C. were never on Omni's payroll. (Ex. A, 205-206).   This evidence is sufficient to rebut and "undermine the credibility of [Defendant's] proffered justification" that Plaintiff was responsible for hiring these employees.  *Laxton*, 333 F.3d at 580 (the Fifth Circuit found that the employee's testimony that she never hired a bank robber because she discovered the problem before the applicant was ever on company payroll was sufficient to rebut the employer's proffered justification).

allowing a vast drug operation run by OHMC employees to exist on the hotel property.[10] Despite the testimony of Smith, Snow, and Rothschild attesting to Cantor's failure in his role as GM in allowing criminal activity on the Colonnade's property, it is undisputed that Cantor only received counseling and his job title and compensation were not otherwise affected in this regard.

Nevertheless, to be clear, Omni's policy does not prohibit the hiring of employees with criminal backgrounds. It is erroneous and misleading for Defendant to imply or assert that Omni had and continues to have, a strict policy against hiring anyone with any type of criminal background. At the time of Plaintiff's employment, Omni did not have a policy expressly prohibiting certain convictions that would preclude employment. Both Snow and Rothschild have testified that there are current Omni employees who have criminal convictions on their record. (Ex. E, 68:5-7); (Ex. F, 27:23-28:4). Moreover, Smith admitted that Omni does hire employees with criminal background. (Ex. D, 40:19-25, 72-74). For Defendant to now come forward after the fact and apply Omni's current policy to Plaintiff is false, prejudicial, and misleading.

Furthermore, conducting background checks is simply not within the HRD's responsibilities. Rothschild has testified that duties of the HRD consist of investigating complaints and grievances, performing any type of third-party audit, identifying talent for the organization, and creating an atmosphere that reflects Omni's culture. (Ex. F, 13:6-24). Plaintiff has submitted evidence in the form of Omni's own written job descriptions demonstrating that the different functions in the HR department were delegated to the HR assistant and HR manager. (Ex. P). One of the stated duties of the HR manager was to conduct background

---

[10] Smith has testified that the GM has the ultimate responsibility in seeing that the hotel property is properly managed. (Ex. D, 11:5-8). Jim Snow has also attested to the same. (Ex. J), as well as Rothschild. (Ex. F, 44:9-12).

checks on potential new employees and this responsibility belonged to the Mendoza, the HR manager at the time Reyna was hired.

During the investigation Plaintiff attempted to explain to Snow that under the process she implemented within the HR department, no associate with a positive criminal background could be hired without her approval.  (Ex. A, 129:14-17).  Her truthful explanation, rejected by Snow, is corroborated by the fact that the current HR manager at the Colonnade, Jessica Jasso, is responsible for performing background checks.  (Ex. C, 75:23-76:6).

Defendant has failed to submit any affirmative evidence supporting its claim that Plaintiff, as HRD, was responsible for performing the task of conducting background checks.  This reason proffered by Defendant as a non-discriminatory reason for Plaintiff's termination serves only as pretext and should not be considered by this Court.  In the alternative, a genuine issue of material fact is raised because the Plaintiff claims she did not violate the policy on background checks based on her understanding of the policy.  *Rachid*, 376 F.3d at 313.

**D.     Cantor retaliated against Plaintiff by making false statements about her role in the investigation regarding the illegal drug activity on the hotel premises.**

In a retaliation claim, the plaintiff has the initial burden of establishing a *prima facie* case and must demonstrate that: (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) a causal link existed between the protected activity and the adverse employment action.  *Gee v. Principi,* 289 F .3d 342, 345 (5th Cir. 2002).

Plaintiff can easily establish the elements of a *prima facie* claim of retaliation.  Prior to counseling Cantor and reporting his retaliatory conduct, Plaintiff described her working relationship with Cantor as "good."  (Ex. A, 81:10-14).  That changed after Plaintiff engaged in protected activity and she complained to Smith about Cantor's continuing retaliation against her. (Ex. D, 26).  Smith in turn reported Plaintiff's complaint to Snow.  Plaintiff's complaint of

20

Cantor's retaliatory conduct towards her even reached the corporate level to Rothschild, who advised Snow to counsel Cantor.  (Ex. A, 187:15-18; 188:25-190:10); (Ex. C, 17-18); (Ex. D, 26:14-27:7); (Ex. E, 13:6-10; (Ex. 17:19-23).  The harassment was especially tough on Plaintiff who emotionally collapsed on occasion because of Cantor's harassing and retaliatory behavior toward her.  Snow admits he was none too happy about counseling Cesar in this regard.  It may be reasonably inferred that Cantor was not pleased to receive counseling from his immediate supervisor for violating company policy as reported by Plaintiff.    Plaintiff suffered an adverse employment action when Snow and Smith made the decision to terminate her employment based on Cantor's false statements.  (Ex. F, 39:24-41; 55-57; 64).

Defendant's argument that there was no causal connection between the protected activity and adverse employment action is ineffectual.  Because the evidence is uncontroverted that Cantor's false statement formed the basis for Plaintiff's termination, Cantor's retaliatory animus can be imputed to the decision-makers, Smith and Snow, who terminated her employment. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2000).  The Fifth Circuit in *Laxton v. Gap Inc.* held that the plaintiff presented sufficient evidence of causation even though the supervisor with the discriminatory animus was not directly responsible for her termination. *Russell v. Univ. of Texas*, 234 Fed. App'x. 195, 203 (5th Cir. 2007)(citing *Laxton*, 333 F.3d at 584-84).  In *Laxton*, employees from the corporate office rather than the plaintiff's immediate supervisor fired the employee for various violations of company policy.  *Id*.  The employee responsible for the employee's termination testified that she relied on the supervisor for the facts underlying the violations.  *Id*.  The Court held that the reliance on the supervisor provided sufficient evidence of his influence over the ultimate decision-makers to demonstrate causation. *Id. Laxton* is factually analogous to the present matter.  Smith, Snow, and Rothschild all testified

that the decision to discharge Plaintiff was based largely in part on Cantor's false statement that Plaintiff "cut the deal" with Reyna.   (Ex. E, 113); (Ex. D, 18, 40-41); (Ex. F, 44).   The overwhelming evidence is unequivocal that Cantor clearly exercised significant influence over Plaintiff's termination.

Likewise, Defendant's argument that a period of eight months is too long of a temporal lapse between the protected activity and the adverse employment action to evidence a causal link is inadequate.   In *Gee v. Principi*, the Fifth Circuit held that time lapse alone does not entitle the defendant to summary judgment.   The Court explained that time is "part of [the] analysis," but not in itself conclusive of [the] determinations of retaliation."   289 F .3d at 347 n.3 (noting that the Court has previously affirmed a finding of retaliation despite a fourteen-month time lapse between the protected activity and the adverse employment action).   The Court further observed as noteworthy that the plaintiff had experienced continuing problems with the supervisor even before the adverse employment occurred.   *Id.*    Similarly, Plaintiff complained about Cantor's retaliatory actions towards her almost immediately after she cautioned him for a third time in August 2008.   The retaliation was continuous in nature and culminated in her discharge based on Cantor's final retaliatory act of making false statements regarding her role in the drug investigation.

Plaintiff also satisfies the "but for" standard of proof, that "but for" her complaint of Cantor's improper sexual behavior and her complaint about his retaliatory response, Cantor would not have had any motivation to falsely allege that Plaintiff "cut the deal" with Reyna. This mendacious fabrication was calculated to, and ultimately formed the basis of the adverse employment action, her wrongful termination.   Cantor's motive to oust Plaintiff, who posed a threat to his job because of her demonstrated enforcement of Omni's anti-harassment policies

against him, has been well-established.  His continuing retaliation against Plaintiff began shortly after she complained to Smith, and this complaint, along with previous reports of his inappropriate behavior with female employees, was also reported up to the corporate level.  (Ex. C, 17-18); (Ex. A, 187:15-18; 188:25-190:10); (Ex. D, 26:8-19); (Ex. E, 11:24-13:22); (Ex. F, 17, 20).  As direct evidence of his retaliatory motive, Cantor uttered the phrase "they are gunning for you" to Plaintiff immediately preceding her interview with Smith and Snow during the drug investigation.  Although Smith testified that there was no policy that the police must be called when an employee is found with drugs, Cantor fabricated the lie that Plaintiff "cut a deal with the drug dealer" in his successful effort to oust Plaintiff as HRD.

Defendant has proffered the same non-discriminatory reasons for why its actions were not motivated by retaliation.  Plaintiff therefore reasserts her arguments, as set forth at length above, that Defendant's non-discriminatory and non-retaliatory reasons are pretext.  Plaintiff was the only female involved in the investigation of the illegal drug activity who was terminated following the investigation; despite the undisputed facts that other males who committed the identical misconduct alleged against Plaintiff were merely counseled, Plaintiff was discharged.  Questions of material fact exist as to whether the failure to call the police upon the discovery of illegal narcotics on the hotel property was indeed a violation of Omni policy; questions of fact exist as to whether Snow and Smith reasonably and in good faith believed Plaintiff "cut the deal" with Reyna; and Plaintiff, as HRD, was not responsible for the hiring of Reyna and other employees with questionable criminal backgrounds.   Moreover, Smith's testimony that Plaintiff's actions in handling the drug investigation were consistent with Omni's "Power of One" philosophy is in direct contravention to Defendant's claim that Plaintiff failed to perform her duties as the HRD in connection with her handling of the drug investigation.  (Ex. D, 86-89).

This broad, conclusory allegation against Plaintiff is further evidence that Defendant's proffered non-discriminatory/retaliatory reasons are pretext.

WHEREFORE PREMISES CONSIDERED, Plaintiff prays that this Court deny Defendant's Motion for Summary Judgment, and for all such other and further relief at law or in equity to which Plaintiff may be justly entitled.

Respectfully submitted,

**DWIGHT E. JEFFERSON, P.L.L.C.**


By:     /s/ Dwight E. Jefferson
          Dwight E. Jefferson
          State Bar No. 10605600
          405 Main Street, Ste. 950
          Houston, Texas  77002
          (713) 222-1222
          (713) 222-1223 (FAX)

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing has been served upon counsel of record, by electronic transmission, on this the 6th day of August, 2010, in accordance with the Federal Rules of Civil Procedure, to wit:

**BY ELECTRONIC TRANSMISSION**

Mr. Bruce A. Griggs
Ms. Angela N. Marshall
Ogletree Deakins Law Firm
300 Congress Ave., Suite 1150
Austin, TX 78710
Phone: (512) 344-4710
Fax: (512) 344-4701

　/s/ Dwight E. Jefferson　　　　　　　　
Dwight E. Jefferson